IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>LYLE STEED JEFFS, et al.,<br><br>                    Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS<br><br><br><br>Case No. 2:16-CR-82 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on a Motion to Dismiss filed by Defendant Lyle Steed Jeffs. The other Defendants have joined the Motion. Defendants seek partial dismissal under the Religious Freedom Restoration Act ("RFRA") and the First Amendment. For the reasons discussed below, the Court will deny the Motion.

I.  BACKGROUND

A.      THE FLDS CHURCH

The Fundamentalist Church of Jesus Christ of Latter-day Saints ("FLDS") is a religion that finds its roots in the Church of Jesus Christ of Latter-day Saints. Communal living is a tenant of the FLDS church. That concept is known as the Law of Consecration or the United Order.

Under the Law of Consecration, faithful members are expected to donate their assets to the FLDS church through a clearinghouse known as the Bishop's Storehouse. An individual who has made a consecration is entitled to seek a "stewardship," or permission to use donated property as is necessary to satisfy the just wants and needs of their family. The Bishop oversees

1

the Storehouse, receiving the items that have been consecrated and attempting to fulfil the just wants and needs of FLDS members.

The Law of Consecration is found in religious texts used in the FLDS church. Throughout its history, FLDS leaders have taught the importance of the Law of Consecration. FLDS members have been taught and believe that their eternal salvation is based, at least in part, on living consistent with the Law of Consecration.

In 2011, Warren Jeffs, the prophet and leader of the FLDS church, initiated the Holy United Order.  Participation in the United Order required members to donate all property, time, money, and goods to the Bishop's Storehouse and also to receive all necessities from the Storehouse.  Membership in the United Order was something to be desired among FLDS members.

B.    SNAP

Congress created the Supplemental Nutrition Assistance Program ("SNAP") "in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households."[1]  SNAP was authorized to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation."[2]  To accomplish this goal in most instances, eligible households are issued an allotment that is then used to purchase eligible food from approved retail food stores.[3]

---

[1] 7 U.S.C. § 2011.

[2] *Id.*

[3] *Id.* § 2013(a).

The definition of "eligible household" is important to the administration of the program and has undergone various changes over the years.[4]  The size of the household determines the level of benefits an applicant may receive.  Further, "[p]articipation in the supplemental nutrition assistance program [is] limited to those households whose incomes and other financial resources, held singly or in joint ownership, are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet."[5]  Currently, household is defined generally as individuals who live together and customarily purchase and prepare meals together.[6]  If a household is determined to meet the eligibility requirements, an allotment may be issued.  "The value of the allotment . . . shall be equal to the cost to such households of the thrifty food plan reduced by an amount equal to 30 per centum of the household's income, as determined in accordance with section 2014(d) and (e) of this title, rounded to the nearest lower whole dollar."[7]

Generally, SNAP benefits may only be used by eligible households to purchase eligible food.[8]  The regulations implementing SNAP similarly state that "[p]rogram benefits may be used only by the household . . . to purchase eligible food for the household."[9]  However, there are no

---

[4] Docket No. 458 Ex. 7 ¶¶ 18–25.

[5] 7 U.S.C. § 2014(a).

[6] *Id.* § 2012(m).

[7] *Id.* § 2017(a).

[8] *Id.* § 2013(a) ("The benefits so received by such households shall be used only to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program."); *id.* § 2016(b) ("Benefits issued to eligible households shall be used by them only to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program at prices prevailing in such stores.").

[9] 7 C.F.R. § 274.7(a); *see also id.* § 278.2(a) ("Coupons may be accepted by an authorized retail food store only from eligible households or the households' authorized representative, and only in exchange for eligible food.").

specific regulations concerning whether an individual may donate foods received from their benefits to a religious organization.

Congress has made it a crime for anyone to knowingly use, transfer, acquire, alter, or possess SNAP benefits "in any manner contrary to this chapter or the regulations issued pursuant to this chapter."[10]  It is also a crime for a person to knowingly present or cause to be presented SNAP benefits "knowing the same to have been received, transferred, or used in any manner in violation of the provisions of this chapter or the regulations issued pursuant to this chapter."[11]

## C.      THE DEFENDANTS

Defendants are members of the FLDS Church.  Defendants have presented evidence attesting to their belief in and commitment to the Law of Consecration.  Defendants state that their eternal salvation depends, in part, on living consistent with the Law of Consecration. Further, Defendants Lyle Steed Jeffs and John Clifton Wayman have presented evidence that they acted as Bishops during the time period covered by the Indictment.  In that role, they would have taught the Law of Consecration and assisted in the distribution of items from the Storehouse.  Defendant Seth Steed Jeffs has presented evidence that he received SNAP benefits. Defendant Seth Jeffs further testified that he has donated food received using SNAP benefits to the Bishop's Storehouse.

## D.      THE INDICTMENT

The Indictment alleges that beginning in 2011, FLDS leaders directed members to divert their SNAP benefits to the Bishop's Storehouse.  Members were told to either purchase items

---

[10] 7 U.S.C. § 2024(b).

[11] *Id.* § 2024(c).

and physically bring them to the Storehouse to be donated, or simply swipe their SNAP cards without the exchange of any food products.  The Indictment alleges that food items were provided to FLDS members who did not qualify to receive SNAP benefits and that converted proceeds were used to purchase non-eligible items.  Defendants are charged with conspiracy to commit SNAP benefits fraud and conspiracy to commit money laundering.

## II.  DISCUSSION

### A.    RFRA

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability."[12]  RFRA creates an exception.  The government may impose such a burden "if it demonstrates that application of the burden to the person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest."[13]  "RFRA allows religious adherents to challenge government activities that encroach on their beliefs."[14]

"To make out a prima facie RFRA defense, a criminal defendant must show by a preponderance of the evidence that government action (1) substantially burdens (2) a religious belief, not merely a philosophy or way of life, (3) that the defendant sincerely holds."[15]  "If a

---

[12] 42 U.S.C. § 2000bb-1(a).

[13] *Id.* § 2000bb-1(b).

[14] *United States v. Quaintance*, 608 F.3d 717, 719 (10th Cir. 2010); *see also* 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.").

[15] *Quaintance*, 608 F.3d at 719.

defendant makes that showing, it falls to the government to show that the challenged action is justified as the least restrictive means of furthering a compelling governmental interest."[16]

All parties ask the Court to limit its determination to whether RFRA protects the following: (1) utilizing SNAP cards to purchase food items that are subsequently consecrated to the FLDS Bishop's Storehouse for distribution to all FLDS members, including those not eligible for SNAP benefits, with the guidance of the church's leadership; and (2) teaching, preaching, or training on the topics of the United Order, the Law of Consecration and/or the procedures by which FLDS members provide and/or receive food items from the FLDS Storehouse.

### 1.    Religious Belief

Defendants must first prove that their beliefs are religious, rather than a philosophy or a way of life.[17] In *United States v. Meyers*, the Tenth Circuit approved consideration of a variety of factors to determine whether a belief is a religious belief.  "Religious beliefs often address fundamental questions about life, purpose, and death."[18] Further, "[r]eligious beliefs often prescribe a particular manner of acting, or way of life, that is 'moral' or 'ethical.'"[19] "A moral or ethical belief structure . . . may create duties—duties often imposed by some higher power, force, or spirit—that require the believer to abnegate elemental self-interest."[20] In addition, there are

---

[16] *Id.* at 719–20.

[17] *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996).

[18] *Id.* at 1483.

[19] *Id.*

[20] *Id.*

certain accoutrements of religion, including the presence of a founder or prophet, important writings, ceremonies and rituals, and the desire to propagate their views.[21]

There is no dispute that the FLDS church is a religion.  There is also no dispute that the Law of Consecration is a tenet of the FLDS church.  The Law of Consecration itself carries many of the indicia of a religious belief set forth above.  The Law of Consecration is found in religious texts held sacred by members of the FLDS church.  It has been taught and expounded upon by FLDS leaders, including current and former prophets.  Leaders of the FLDS Church routinely teach this principle to its members.  The Law of Consecration also prescribes a particular way of life that is considered moral and ethical.[22]  It creates a duty imposed by God that requires members to act in a certain way.  As Defendant Seth Steed Jeffs explained,

> I believe that the law of consecration is lived in heaven.  I believe I'm preparing for that.  I'm learning right now how to live with heavenly father, and I believe that all of the principles taught by the prophets are given to us now so that we can learn that in preparation for what comes after life.[23]

Based upon this, the Court finds that Defendants' belief in living and teaching the Law of Consecration is religious in nature.

---

[21] *Id.* at 1483–84.

[22] *Id.* at 1483 ("A moral or ethical belief structure . . . may create duties—duties often imposed by some higher power, force, or spirit—that require the believer to abnegate elemental self-interest.").

[23] Docket No. 661, at 72:17–23.

2.    *Sincerely Held*

Defendants must also establish that their beliefs are sincerely held.  The issue of sincerity is a factual matter.[24]  In making this determination, the Court may not decide "whether the claimant's religious belief is true."[25]  "Courts are not arbiters of scriptural interpretation."[26]

> When inquiring into a claimant's sincerity . . . our task is instead a more modest one, limited to asking whether the claimant is (in essence) seeking to perpetrate a fraud on the court—whether he actually holds the beliefs he claims to hold—a comparatively familiar task for secular courts that are regularly called on to make credibility assessments—and an important task, too, for ensuring the integrity of any judicial proceeding.[27]

"[A]n adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief, or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine."[28]  Similarly, a belief may not be sincere if it is "motivated by commercial or secular motives rather than sincere religious conviction."[29]  However, "[a] finding of sincerity does not require perfect adherence to beliefs expressed by the [claimant], and even the most sincere practitioner may stray from time to time."[30]  "[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance."[31]

---

[24] *Meyers*, 95 F.3d at 1482.

[25] *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014).

[26] *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981).

[27] *Yellowbear*, 741 F.3d at 54.

[28] *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981) (citations omitted).

[29] *Quaintance*, 608 F.3d at 722.

[30] *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 791 (5th Cir. 2012).

[31] *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012).

Defendants have presented evidence demonstrating that they are lifelong members of the FLDS church.  As such, they have been taught to live according to the principles of the FLDS church, including the Law of Consecration.  Defendants' beliefs are a critical source of guidance and comfort to them at important times in their lives.  Further, Defendants strive to live in a way consistent with their beliefs and believe that their eternal salvation depends, at least in part, on doing so.

The government argues that Defendants' factual showing is insufficient.  The government argues that Defendants' general statements concerning their belief in the Law of Consecration and their desire to teach that principle are insufficient.  The government contends that Defendants must identify a religious belief in consecrating SNAP benefits or teaching others to donate their SNAP benefits.

In support, the government points to *Guam v. Guerrero*[32] and *United States v. Bauer*.[33]  Both cases involved adherents to Rastafarianism who had been charged with importation and distribution of marijuana, respectively.  The defendants argued that they had a sincerely held religious belief in using marijuana.  The Ninth Circuit held that while the defendants might have a sincerely held belief in using marijuana, they had failed to demonstrate that anything in Rastafarianism required the distribution or importation of marijuana.[34]  Therefore, laws prohibiting that conduct did not impose a substantial burden.

The Court disagrees that Defendants' showing here is insufficient.  The government's argument fails to fully appreciate the Law of Consecration, as Defendants understand it.

---

[32] 290 F.3d 1210 (9th Cir. 2002).

[33] 84 F.3d 1549 (9th Cir. 1996).

[34] *Guerrero*, 290 F.3d at 1222–23; *Bauer*, 84 F.3d at 1559.

Defendants have presented evidence that the Law of Consecration requires them to donate everything that comes under their care.[35]  This necessarily includes SNAP benefits that they might receive.  Thus, unlike the conduct at issue in *Guerrero* and *Bauer*, where the importation and distribution of marijuana was not part of the defendant's religion, Defendants' religious beliefs would require the consecration of food obtained using SNAP benefits, if they received it.

The government also more specifically challenges the sincerity of the beliefs of Defendants Lyle Jeffs and John Wayman.  The government argues that these Defendants have acted in ways that were inconsistent with their professed beliefs and engaged in conduct that was motivated by their financial interests, not their religious beliefs.  The government has provided evidence showing that Defendants Lyle Jeffs and John Wayman enjoyed preferential treatment, even when the Bishop's Storehouse could not meet the needs of average members.  It is unclear from the record, however, whether this preferential treatment was requested by these Defendants or whether those who worked at the Storehouse did this of their own accord.  Defendant Lyle Jeffs has presented evidence that he directed that neither he nor his family was to get special treatment when filling needs from the Storehouse.  From the evidence presented, the Court cannot conclude that Defendants' beliefs were not sincere merely because they received preferential treatment from Storehouse resources.  In fact, preferential treatment for Bishops has at least historical, if not religious, underpinnings.[36]

More troubling is the evidence that Defendant Lyle Jeffs was not required, as were other members, to utilize the Storehouse to obtain his food and evidence that Mr. Jeffs used

---

[35] Docket No. 661, at 68:12–69:16.

[36] Docket No. 661, at 29:9–30:6; *see also* Docket No. 550, at 8 (citing Doctrine and Covenants 42:71–73) .

Storehouse funds to purchase items for his own benefit.  Apparently, Mr. Jeffs had an appetite for foods that were not found at the Storehouse and he authorized the use of Storehouse funds to purchase those items.  This included "high quality meats, steaks, and vegetables" and "[l]uxury items such as chocolates, nuts, and bakery items."[37]  These items were available to Defendant Lyle Jeffs and his family, but not other members.  Defendant Lyle Jeffs also authorized the use of Storehouse funds to purchase items used for extravagant meals prepared exclusively for him and his guests.[38]  Defendant knew full well that his meals were not prepared from Storehouse ingredients.[39]  There is also evidence Defendant Jeffs used money from the Storehouse to purchase a luxury vehicle.[40]

Moreover, the evidence shows that Lyle Jeffs was not required to endure the same type of hardship the other members faced.  Not only did Defendant Jeffs receive preferential treatment, he lived a much more extravagant lifestyle than other members.[41]  He had new clothing.[42]  He and his family received the nicest amenities and the best food.[43]  His family ate three substantial meals a day, including meat twice a day, while others would not receive meat for months at a time.[44]  When given the opportunity, Defendant did not dispute this evidence.

---

[37] Docket No. 458 Ex. 6 ¶ 13.

[38] *Id.* Ex. 4 ¶ 6.

[39] *Id.* Ex. 3 ¶ 5.

[40] *Id.* Ex. 6 ¶ 14.

[41] *Id.* Ex. 4 ¶ 4.

[42] *Id.* Ex. 6 ¶ 13.

[43] *Id.* Ex. 4 ¶ 4.

[44] *Id.*

Based on this, the Court cannot conclude that Defendant Lyle Jeffs has a sincerely held belief in the Law of Consecration. Defendant Jeffs acted inconsistently with the Law of Consecration and materially benefitted from others' adherence. The evidence demonstrates that while others were required to obtain the items to fulfill the just wants and needs of their family from the Storehouse, Defendant Jeffs was not. He used Storehouse funds to purchase the items he and his family wanted that could not be obtained from the Storehouse. Based upon this evidence, the Court finds that Defendant Lyle Jeffs has failed to provide evidence that his belief in the Law of Consecration is sincere.

3. *Substantial Burden*

Having found that the majority of Defendants have established a sincere religious belief, the question becomes whether Defendants' "religious exercise is substantially burdened by the regulation at issue."[45] The government contends that the SNAP statutes and regulations require SNAP beneficiaries only use their SNAP benefits to purchase eligible foods for their household. In this way, the statutes and regulations prevent members of the FLDS church from donating food received through the use of their SNAP benefits. For the purposes of this Motion, the Court will accept the government's statement of the law as true.

> [A] government act imposes a "substantial burden" on religious exercise if it: (1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief.[46]

---

[45] *United States v. Wilgus*, 638 F.3d 1274, 1279 (10th Cir. 2011).

[46] *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013) (en banc), *aff'd sub nom.*, *Burwell v. Hobby Lobby Stores, Inc.*, ---U.S.---, 134 S. Ct. 2751 (2014) (quotation marks and alterations omitted).

Defendants argue they have been substantially burdened in four primary ways.  First, Defendants argue that this prosecution itself is a substantial burden.  Second, Defendants argue that enforcement of the SNAP statutes and regulations will substantially burden FLDS members.  Third, Defendants argue that enforcement of the SNAP statutes and regulations will interfere with their ability to practice the Law of Consecration.  Fourth, Defendants argue that the SNAP statutes and regulations interfere with their ability to teach the Law of Consecration.[47]  In addition to these four primary arguments, various Defendants have made arguments as to how the SNAP statutes and regulations might substantially burden their sincerely held religious beliefs.  The Court will discuss each argument in turn.

> a.    Prosecution

Defendants first argue that the mere fact that they are being prosecuted demonstrates a substantial burden.  Defendants rely on *Navajo Nation v. United States Forest Service*.[48]  In that case, the Ninth Circuit stated: "Under RFRA, 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions . . . ."[49]  Support for the second statement comes from the Supreme Court

---

[47] Underlying Defendants' concerns about living and teaching the Law of Consecration is that their eternal salvation depends, at least in part, on doing so.

[48] 535 F.3d 1058 (9th Cir. 2008).

[49] *Id.* at 1069–70.

case of *Wisconsin v. Yoder*,[50] one of the cases establishing the substantial burden test the drafters of RFRA sought to restore.[51]

In *Yoder*, the defendants were members of the Amish religion who had been convicted of violating Wisconsin's compulsory school attendance law after declining to send their children to public school after they completed the eighth grade.[52]  The Supreme Court reversed their convictions based on the First Amendment.  The Court held that the compulsory attendance law "compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."[53]  Rather than concluding that the mere fact of prosecution was sufficient to establish a substantial burden, the Court considered the effect the compulsory education law had on the defendants' religious beliefs.

> [S]econdary schooling, by exposing Amish children to worldly influences in terms of attitudes, goals, and values contrary to beliefs, and by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child.[54]

Just as the Court in *Yoder* considered the effect of Wisconsin's compulsory attendance law on Amish parents and children, so too must this Court examine how the SNAP statutes and

---

[50] 406 U.S. 205 (1976).

[51] *See* 42 U.S.C. § 2000bb(b)(1).

[52] *Yoder*, 406 U.S. at 207–08.

[53] *Id.* at 218.

[54] *Id.*; *see also id.* at 219 ("In sum, the unchallenged testimony of acknowledged experts in education and religious history, almost 300 years of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life support the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of respondents' religious beliefs.").

regulations might interfere with the conduct for which Defendants seek protection.[55]  This makes sense because if the mere fact of prosecution were enough to trigger a substantial burden, every criminal Defendant raising a RFRA claim would be able to succeed on this element, rendering the substantial burden portion of the RFRA test superfluous in criminal cases.  Nothing in RFRA or the case law supports this conclusion.

For example, in *United States v. Friday*,[56] a case where the defendant was charged with shooting an eagle without a permit, the Tenth Circuit had to examine "whether Mr. Friday's religious exercise has been substantially burdened."[57]  The court was "skeptical that the bare requirement of obtaining a permit can be regarded as a 'substantial burden' under RFRA," but decided the case on alternative grounds.[58]  There, as in *Yoder*, the court looked at the effect of the statute on the defendant to determine whether a substantial burden existed, not merely at the fact that he had been prosecuted.  Thus, the Court rejects Defendants' argument that the existence of this prosecution alone presents a substantial burden.  To be sure, statutes and regulations carrying criminal penalties may impose a substantial burden.  But the Court must look at how those statutes and regulations relate to Defendants' religious exercise to determine whether a substantial burden exists.

---

[55] *See, e.g., Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1177 (10th Cir. 2015), *vacated*, *Zubik v. Burwell*, ---U.S.---, 136 S. Ct. 1557 (2016) ("In determining whether a law or policy applies substantial pressure on a claimant to violate his or her beliefs, we consider how the law or policy being challenged actually operates and affects religious exercise.").

[56] 525 F.3d 938 (10th Cir. 2008).

[57] *Id.* at 947.

[58] *Id.*

*United States v. Gonzales*,[59] a case relied upon by Defendant Lyle Jeffs, does not alter this conclusion.  In *Gonzales*, a Native American defendant was charged with killing a bald eagle.  The government argued that the defendant lacked standing to challenge the statute and regulations at issue.  The court disagreed, reasoning that the fact that the defendant had been charged with a crime was sufficient to provide the defendant with standing.[60]

Here, there is no argument by the government that Defendants lack standing.  Instead, the issue is whether Defendants can meet their burden under RFRA by demonstrating that their sincerely held religious beliefs have been substantially burdened.  Defendants' argument confuses the two issues.  The fact that Defendants have standing to assert a RFRA defense does not relieve them of proving entitlement to relief under that defense by showing that their sincerely held religious beliefs have been substantially burdened.

*Gonzales* illustrates this point.  The defendant in that case challenged regulations allowing an applicant to seek a permit to take an eagle.  The court concluded that the defendant had standing to challenge these regulations, both as applied and facially, even though he had not engaged in the application process.  Having found that the defendant had standing, the court went on to find that the regulations at issue imposed a substantial burden.  The court so found, not because the defendant had been prosecuted, but because the application regulations required him to disclose confidential information that was sacred to him.[61]

---

[59] 957 F. Supp. 1225 (D. N.M. 1997).

[60] *Id*. at 1227.

[61] *Id*. at 1228.

The cases relied upon by Defendant John Wayman do not compel a different conclusion. In *United States v. Boyll*,[62] the court concluded that a regulation restricting the defendant's use of peyote would substantially burden his sincerely held religious beliefs because of the importance peyote played in the religion practiced by the defendant.[63]  *United States v. Abeyta*,[64] involved a case where the defendant had killed a golden eagle to procure its feathers for use in a religious ceremony.  In that case, it was "clear that Abeyta's killing of a golden eagle was an act of religious belief."[65]  By prohibiting him from taking an eagle, the Bald and Golden Eagle Protection Act interfered with the defendant's ability to practice his religion.  Thus, his conduct could only "be punished if the government demonstrates that such an application of the Bald and Golden Eagle Protection Act will advance a compelling governmental interest and that the act embodies the least restrictive means by which the government interest can be vindicated."[66] Nothing in these cases suggests that the mere fact that the defendants were being prosecuted was sufficient to meet their burden of showing their sincerely held religious beliefs were substantially burdened.

>    b.    *Effect on Others*

Defendants next emphasize the effect the SNAP statutes and regulations have on FLDS members generally, including co-Defendants, unindicted co-conspirators, and family members. But, again, this is not the relevant inquiry.  RFRA states that the "Government shall not

---

[62] 774 F. Supp. 1333 (D. N.M. 1991).

[63] *Id.* at 1341.

[64] 632 F. Supp. 1301 (D. N.M. 1986).

[65] *Id.* at 1307.

[66] *Id.*

substantially burden *a person's* exercise of religion even if the burden results from a rule of general applicability."[67]  "*A person* whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."[68]  Just as the Court must make a focused inquiry on the government's stated interest, the Court must assess "the coercive impact [of] the government's actions *on the individual claimant's ability to engage in a religious exercise*, as he understands that exercise and the terms of his faith."[69]

In assessing whether there is a substantial burden, the Court must look individually at each Defendant, not their co-Defendants, unindicted co-conspirators, family members or the FLDS population as a whole.  These Defendants must demonstrate that the SNAP statutes and regulations substantially burden their sincerely held religious beliefs.[70]  Those who are not substantially burdened by the SNAP statutes and regulations cannot bootstrap their claims onto those who might be.  The fact that the SNAP statutes and regulations may interfere with other FLDS members' religious beliefs is not relevant to the issue before the Court and this Motion is not the proper place to address those concerns.  Unless these Defendants can show how the SNAP statutes and regulations substantially burden their own exercise of their sincerely held beliefs, their claim fails.

---

[67] 42 U.S.C. § 2000bb-1(a) (emphasis added).

[68] *Id.* § 2000bb-1(c) (emphasis added)

[69] *Yellowbear*, 741 F.3d at 55 (emphasis added).

[70] *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1314 (10th Cir. 2010) ("[T]he issue is not whether the lack of a halal diet that includes meats substantially burdens the religious exercise of any Muslim practitioner, but whether it substantially burdens *Mr. Abdulhaseeb's* own exercise of his sincerely held religious beliefs.").

c.      *Living the Law of Consecration*

Defendants contend that the SNAP statutes and regulations will prevent them from living the Law of Consecration. However, this argument necessarily depends on Defendants receiving SNAP benefits. If Defendants do not receive SNAP benefits, the SNAP statutes and regulations preventing the donation of those benefits have no effect on Defendants. They cannot consecrate what they do not have and nothing in the SNAP statutes and regulations prevent Defendants from consecrating other property.

Only Defendant Seth Jeffs has presented any evidence that he received SNAP benefits and donated food received from the use of SNAP benefits.[71] The Court concludes that SNAP statutes and regulations that would preclude Defendant Seth Jeffs from donating food received through the use of those benefits would substantially burden his sincerely held beliefs. As such, they would either prevent participation in conduct motivated by a sincerely held religious belief or place substantial pressure on him to engage in conduct contrary to a sincerely held religious belief. Thus, the Court concludes that Defendant Seth Jeffs has met his burden of showing that his sincerely held religious beliefs are substantially burdened by the SNAP statutes and regulations.[72]

The other Defendants argue that, even though they do not personally receive SNAP benefits, they are nevertheless substantially burdened by the SNAP statutes and regulations

---

[71] Defendant Winford Barlow states that members of his family are recipients of SNAP benefits. However, for the reasons discussed, this is not sufficient.

[72] The government argues that Defendant Seth Jeffs is likely not eligible to receive SNAP benefits since he and his family did not disclose that their needs were being met through the Bishop's Storehouse. However, the government has not presented any evidence to support this position.

because they are asserting both a facial challenge and an as applied challenge.  "A facial challenge is one that contends the statute is impermissible in all, or at least the 'vast majority[,] of its intended applications.'"[73]  Defendants have made no attempt to show that the SNAP statutes and regulations are forbidden by RFRA in the vast majority of their applications, nor could they.  Therefore, Defendants' facial challenge fails.

> ### d.    Teaching the Law of Consecration

Defendants next argue that the SNAP statutes and regulations substantially burden their ability to teach and preach the Law of Consecration.  Defendants have stated that they have a sincere belief in not only living the Law of Consecration, but also in teaching it to others.  This teaching takes different forms, depending on their role in the community.  While some, such as a Bishop, may teach the importance of the Law of Consecration to a large congregation, others may be limited to teaching that principle to their immediate family members.  Regardless of how this teaching is done, the Court concludes that all Defendants, with the exception of Lyle Jeffs as discussed, have a sincerely held belief that requires them to teach the Law of Consecration in some form or another.

As a result, the Court must consider whether the SNAP statutes and regulations impose a substantial burden on Defendants' ability to teach the Law of Consecration.  Not every burden is a substantial one.[74]  As stated, a government act imposes a "substantial burden" if it: (1) requires

_____

[73] *Friday*, 525 F.3d at 951 (quoting *Doctor John's Inc. v. City of Roy*, 465 F.3d 1150, 1157 n.5 (10th Cir. 2006)).

[74] *See Abdulhaseeb*, 600 F.3d at 1321 ("We are not willing to conclude, however, that every single presentation of a meal an inmate considers impermissible constitutes a substantial

participation in an activity prohibited by a sincerely held religious belief, (2) prevents

participation in conduct motivated by a sincerely held religious belief, or (3) places substantial

pressure on an adherent to engage in conduct contrary to a sincerely held religious belief.[75]  In

making this determination, the Court looks to the "intensity of the coercion applied by the

government to act contrary to those beliefs."[76]  While the SNAP statutes and regulations may

impose some burden on Defendants with respect to teaching the Law of Consecration, the Court

cannot conclude that any such burden is substantial.

Nothing in the SNAP statutes and regulations require Defendants to participate in activity

prohibited by their sincerely held religious beliefs.  Further, nothing in the SNAP statutes and

regulations specifically prevent Defendants from teaching the Law of Consecration, nor do they

place substantial pressure on Defendants to not teach the Law of Consecration.  At most, the

SNAP statutes and regulations would prevent Defendants from discussing a limited range of

government benefits when teaching the Law of Consecration.  The government acknowledges

that Defendants can teach the Law of Consecration without risking prosecution if they do not

mention SNAP benefits.[77]  The Court cannot conclude that this slight limitation on conduct

presents a substantial burden.

---

burden on an inmate's religious exercise."); *Friday*, 525 F.3d at 947 ("We are skeptical that the
bare requirement of obtaining a permit can be regarded as a 'substantial burden' under RFRA, at
least in this case.").

[75] *Hobby Lobby Stores, Inc.*, 723 F.3d at 1138.

[76] *Id.* at 1137.

[77] Docket No. 458, at 10.  Defendant John Wayman argues that he is being prosecuted
even though he did not preach specifically about SNAP benefits.  This argument, however,
ignores the other allegations against him in the Indictment.  *See* Docket No. 1 ¶¶ 16, 32.

This situation is distinguishable from *Abdulhaseeb v. Calbone*, a case relied upon by Defendants.  In that case, a Muslim prisoner argued that denial of a halal diet substantially burdened his sincerely held religious beliefs.  The plaintiff was presented with a Hobson's choice: "either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat."[78]  The court found this sufficient to survive summary judgment.  The "failure to provide a halal diet either prevents Mr. Abdulhaseeb's religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise."[79]

The same cannot be said here.  Defendants are not prevented from teaching the Law of Consecration.  Defendants retain the right and ability to so teach, though their ability to do so with specific reference to SNAP benefits may be somewhat limited.  But "[i]t is one thing to curtail various ways of expressing belief, for which alternative ways of expressing belief may be found.  It is another thing to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion."[80]  At most, the SNAP statutes and regulations curtail various ways in which Defendants can express their beliefs, leaving open other methods of expressing those beliefs.[81]  Thus, Defendants have not shown that their sincerely held religious beliefs related to teaching the Law of Consecration are substantially burdened by the SNAP statutes and regulations.

e.      *Other Potential Burdens*

---

[78] *Abdulhaseeb*, 600 F.3d at 1317.

[79] *Id.*

[80] *Id.* (quoting *Beerheide v. Suthers*, 286 F.3d 1179, 1192 (10th Cir. 2002)).

[81] *See, e.g., Henderson v. Kennedy*, 253 F.3d 12, 16–17 (D.C. Cir. 2001) (finding no substantial burden where alternative means were available to spread religious group's message).

In addition to these four primary arguments, four other arguments are worthy of brief discussion.  First, Defendant Lyle Jeffs argues that he may suffer consequences should he ignore the directives of Warren Jeffs.  However, RFRA is concerned with governmental action.  Thus, the harm Defendants may suffer as a result of hypothetical disobedience to Warren Jeffs is irrelevant.

Second, Defendant Hyrum Dutson argues that "[i]f faithful members did not donate all they have there would . . . not be enough in the Community Storehouse to meet the needs of the members.  Therefore, I would not be able to live off of what I receive from the Community Storehouse and would have to seek sustenance elsewhere, which would make me unworthy in my religious commitments to the United Order and the FLDS faith, and hinder my eternal salvation."[82]  This argument is not supported by any evidence.  It is unclear what effect, if any, prohibiting FLDS members from donating food received from SNAP benefits will have on others.  After all, the food that would have been donated will be consumed in the home, reducing the demand on the Bishop's Storehouse, allowing Defendant Dutson and others like him to continue receiving goods from the Storehouse in accordance with their beliefs.

Third, Defendant Winford Barlow argues that if the government prohibits SNAP beneficiaries from using their SNAP cards at Meadowayne Dairy, where he works, it would negatively affect his ability to consecrate his time to the Dairy.  The Court is unaware of any request by the government to limit where SNAP recipients might use their cards.  Even if the government was seeking such a limitation, it is difficult to see how this would substantially

---

[82] Docket No. 665, ¶ 9.

burden Defendant Barlow's ability to work at the Dairy.  He remains free to consecrate his time as he sees fit.

Finally, Defendant Seth Jeffs argues that his ability to work at the Storehouse would be substantially burdened by the SNAP statutes and regulations.  However, nothing in the statutes and regulations would interfere with any Defendants' ability to work at the Storehouse. Defendant Seth Jeffs retains the ability to dedicate his labors to the Storehouse.

    *4.     Compelling Interest*

Since Seth Jeffs has met his burden, the burden shifts to the government to show that the challenged action is justified as the least restrictive means of furthering a compelling governmental interest.

The compelling interest at issue here is found in the Congressional declaration of policy set out in 7 U.S.C. § 2011.

> It is declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households. Congress finds that the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. Congress further finds that increased utilization of food in establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of the Nation's agricultural abundance and will strengthen the Nation's agricultural economy, as well as result in more orderly marketing and distribution of foods. To alleviate such hunger and malnutrition, a supplemental nutrition assistance program is herein authorized which will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation.[83]

To accomplish the goal of alleviating hunger and malnutrition among low-income households, an allotment is issued to eligible households to provide that household the

---

[83] 7 U.S.C. § 2011.

"opportunity to obtain a more nutritious diet."[84]  This allotment is then to be used by the

household to purchase food from approved retail stores.[85]

Participation in SNAP is "limited to those households whose incomes and other financial

resources, held singly or in joint ownership, are determined to be a substantial limiting factor in

permitting them to obtain a more nutritious diet."[86]  Eligibility is based on the concept of the

"household."  Generally, a household is defined as those individuals "who live together and

customarily purchase food and prepare meals together for home consumption."[87]  However,

Congress has expanded the definition of household to include certain people who live in group

settings.[88]

> These limited exceptions to SNAP ineligibility of residents of institutions and
> boarding houses reflect Congressional intent in protecting taxpayer investment in
> SNAP, such that SNAP benefits are issued to and benefit only those who are truly
> needy, while also serving low-income populations with special needs, such as the
> elderly, homeless, individuals with disabilities or drug dependencies, and victims
> of domestic violence.[89]

Despite this limited expansion of the definition of household, neither Congress nor the USDA

has permitted non-eligible individuals to receive or make use of another's SNAP benefits.[90]

"Strict adherence to the concept of the household is vital in SNAP because it is a

foundation principle for SNAP.  Household composition must be determined correctly in order to

---

[84] *Id.* § 2013(a).

[85] *Id.*

[86] *Id.* § 2014(a).

[87] *Id.* § 2012(m)(1)(B).

[88] *Id.* § 2012(m)(5).

[89] Docket No. 458 Ex. 7 ¶ 25.

[90] Docket No. 661, at 128:16–22.

determine eligibility for SNAP and the correct benefit allotments."[91]   Another important aspect

of the SNAP program is how benefits are to be used.  Under the statutes and regulations, SNAP

benefits are to be used only to purchase eligible food.[92]   As stated, the government contends that

these statutes and regulations prohibit SNAP recipients from donating food received through the

use of SNAP benefits.

Defendants do not appear to take issue with the government's general interests in

increasing the purchasing power for needy individuals and preventing fraud and abuse.[93]

However, as Defendants correctly point out, it is not enough for the government to support its

action using mere generalities.  RFRA demands a "more focused" inquiry.[94]   "RFRA requires the

Government to demonstrate that the compelling interest test is satisfied through application of

the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is

being substantially burdened."[95]   The Court must "look[] beyond broadly formulated interests"

and "scrutinize[] the asserted harm of granting specific exemptions to particular religious

---

[91] Docket No. 458 Ex. 7 ¶ 19.

[92] 7 U.S.C. § 2013(a) ("The benefits so received by such households shall be used only to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program."); *id.* § 2016(b) ("Benefits issued to eligible households shall be used by them only to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program at prices prevailing in such stores."); 7 C.F.R. § 274.7(a) ("Program benefits may be used only by the household, or other persons the household selects, to purchase eligible food for the household . . . .").

[93] Docket No. 625, at 18 ("Lyle Jeffs takes no umbrage with the general principles of feeding people and preventing fraud as a compelling interest."); Docket No. 674, at 5 ("Seth Jeffs concedes the government can show a compelling interest in the determination of a household and who receives SNAP benefits.").

[94] *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 430 (2006).

[95] *Id.* at 430–31 (quoting 42 U.S.C. § 2000bb-1(b)).

claimants."[96]  "Put simply, we must examine both sides of the ledger on the same case-specific level of generality: asking whether the government's particular interest in burdening this [defendant's] particular religious exercise is justified in light of the record in this case."[97]

Defendants make a number of arguments in support of their claim that the government's stated interests are not compelling as applied to them.  Defendants first argue that the government's interests are not compelling because consecrating food obtained using SNAP benefits does not violate the SNAP statutes and regulations.  In support, Defendants point to the testimony of Jeffrey Cohen, Deputy Associate Administrator for SNAP.  Mr. Cohen testified at the evidentiary hearing that there was no specific statute or regulation that addressed the donation of food obtained through the use of SNAP benefits.  Based on this, Defendants argue that there is no statute or regulation that has been violated by the conduct alleged.  This argument fails for two reasons.

First, Defendants oversimplify Mr. Cohen's testimony.  It is true that Mr. Cohen testified that there was no specific statute or regulation that addressed donating food received through the use of SNAP benefits.  However, the fact that there is no specific statute or regulation dealing with donating food does not mean that there is no statute or regulation at issue.  As set forth above, and testified to by Mr. Cohen, the regulations require SNAP benefits to be used to purchase foods to be used by the household.[98]  Mr. Cohen stated that wholesale donation of foods received using SNAP benefits would violate the spirit, if not the letter, of the SNAP

---

[96] *Id.* at 431.

[97] *Yellowbear*, 741 F.3d at 57.

[98] Docket No. 661, at 129: 7–19, 151:11–13; 7 U.S.C. §§ 2013(a), 2016(a); 7 C.F.R. § 274.7(a).

statutes and regulations.[99]  The reason there is no more specific regulation on donating food, according to Mr. Cohen, is that there have been no instances worthy of further regulations on this issue.[100]  While bringing SNAP-acquired food to a neighborhood potluck would likely not cause any issues, more systematic donations, such as those alleged here, "will raise some questions."[101]

Second, the statutes and regulations need not address the specific conduct at issue in this case.[102]  The statutes and regulations set out approved conduct and prohibit contrary conduct.[103]  Thus, the fact that there is no specific statute or regulation that would prohibit the donation of food obtained through the use of SNAP benefits does not resolve this Motion.

Defendants also argue that the government's interests are not compelling because the United States Department of Agriculture ("USDA") does not regulate the conduct of SNAP recipients post-purchase.  This argument, however, ignores the testimony of Mr. Cohen and the regulations set forth above requiring SNAP benefits to be used to purchase foods for the household.  Further, if SNAP recipients do not keep and consume the food purchased through the use of their benefits, the goals of the program would clearly be frustrated.

Defendants also argue that the government's interest is not compelling because, rather than interfering with the government's interests, allowing FLDS members to donate food received from the use of those benefits would actually better serve the governments' interests.  "Under the Law of Consecration, FLDS SNAP benefit holders pool their benefit resources, buy

---

[99] Docket No. 661, at 154:5–22.

[100] *Id.* at 130:1–8, 148:14–22.

[101] *Id.* at 130:8.

[102] *United States v. Salazar*, 720 F.2d 1482, 1484–85 (10th Cir. 1983).

[103] *Id.* at 1485; *see also* 7 U.S.C. § 2024(b), (c).

in bulk, have more food, and feed more people, SNAP benefit holders and non-eligible individuals alike."[104]  "In this scenario, the Government's 'compelling interest' is actually realized when FLDS members' religious dictates are allowed to occur."[105]

Mr. Cohen acknowledged that "there may be a case" where, because of bulk purchasing, a "household is getting more than what they would have otherwise gotten."[106]  Unfortunately for Defendants, this imagined scenario lacks any factual support.  Indeed, the evidence presented reveals that reality was just the opposite.  The government has presented evidence showing shortages at the Bishop's Storehouse, and there is evidence directly linking those shortages to the fact that non-eligible individuals were given items obtained from the use of SNAP benefits.

For example, in her Declaration, Sheryl Barlow stated:

> The shortage of food related primarily to the fact that food stamps constituted the major funding source for the Storehouse.  However, in addition to food stamp recipients, the Storehouse supplied individuals who were not food stamp beneficiaries.  Therefore insufficient resources existed to support the large number of people relying on the Storehouse.[107]

Allene Steed similarly stated that the shortages were caused, at least in part, because non-eligible individuals were making use of food obtained through SNAP benefits.[108]

Defendants further argue that the government's purported interest in raising levels of nutrition among low-income households is not compelling because it has not been pursued uniformly.  In support, Defendants point out that the USDA places few restrictions on the food

---

[104] Docket No. 625, at 20.

[105] Docket No. 269, at 27.

[106] Docket No. 661, at 141:12–14.

[107] Docket No. 458 Ex. 1 ¶ 13.

[108] *Id.* Ex. 3 ¶ 7 ("Because not all [United Order] members received SNAP benefits, there were not sufficient resources to provide food for all [United Order] members.").

items that can be purchased by using SNAP benefits.  Thus, SNAP recipients can use their benefits to buy unhealthy food, frustrating the government's interest in providing for a more nutritious diet.  While there are few limitations on what food can be purchased using SNAP benefits, there is a stark difference between what the USDA has allowed and what Defendants seek.  It is one thing to buy unhealthy food that is ultimately consumed by the household.  It is quite another to buy food, give it away, and hope that at least some makes its way back.  Rather than seeking the ability to buy certain items, Defendants seek the ability to allow wholesale donation of food received through SNAP benefits and to allow non-eligible individuals to share the benefits received by SNAP beneficiaries.  The USDA has never permitted such activities.  Thus, this argument fails.[109]  Accordingly, the government has shown that it has a compelling interest in limiting the use of SNAP benefits to the purchase of food to be used by the household.

### 5.  *Least Restrictive Means*

Having determined that the government has a compelling interest, the next question is whether the SNAP statutes and regulations are the least restrictive means of furthering that interest.  "[T]he government's burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger."[110]  The government need not "'refute every conceivable option in order to satisfy the least restrictive means prong of

---

[109] *Yellowbear*, 741 F.3d at 61 ("A government can rebut an argument from underinclusion by showing that it hasn't acted in a logically inconsistent way—by (say) identifying a qualitative or quantitative difference between the particular religious exemption requested and other secular exceptions already tolerated, and then explaining how such differential treatment furthers some distinct compelling governmental concern.").

[110] *Wilgus*, 638 F.3d at 1289.

RFRA.'"[111]  Instead, to successfully refute the alternative schemes offered by Defendants, the government must "demonstrate the claimant's alternatives are ineffective to achieve the government's stated goals."[112]

The government's choice of regulation is supported for the reasons set forth above. Limiting the use of SNAP benefits to purchase food to be used by the household promotes the government's interests in providing food to needy individuals while combatting fraud and abuse. Thus, the Court must consider the alternative schemes offered by Defendants.

Defendant Lyle Jeffs' proposed accommodation has four elements: (1) allow FLDS members who have legally obtained SNAP benefits to donate the food they obtain from these benefits to the Bishop's Storehouse or consecrate the SNAP benefits to the Storehouse for the express purpose of purchasing food; (2) allow FLDS members who have legally obtained SNAP benefits to permit an authorized representative to manage their SNAP benefits, with the express requirement that those benefits only be used to purchase food; (3) allow FLDS members or their authorized representative to pool their benefits to purchase bulk food items; and (4) allow FLDS members who are not eligible to receive SNAP benefits to receive a portion of a SNAP benefit holder's food during distribution from the Bishop's Storehouse.[113]

Defendants' proposed alternative suffers from at least two flaws.  First, by allowing SNAP recipients to donate either their food or their benefits, Defendants' scheme would

---

[111] *Id.* (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1556 (8th Cir. 1996)).

[112] *Yellowbear*, 741 F.3d at 63.

[113] Docket No. 625, at 21–22.  Defendant Wayman offers a similar alternative that would allow FLDS members to combine both SNAP and non-SNAP resources.  *See* Docket No. 664, at 14.  Defendant Seth Jeffs raises a number of questions on what SNAP administrators could have done differently, but none of these questions demonstrate a less restrictive means.  *See* Docket No. 628, at 7.

necessarily interfere with SNAP benefits being used to purchase foods to be used by the household.  While Defendants propose allowing the pooling of benefits to purchase bulk food items, there is no evidence that this would increase available food.  As discussed, the evidence presented in this case shows that the previous pooling of benefits resulted in a reduction of food, not a surplus.

Second, Defendants' scheme fails to promote the government's interests because it allows non-eligible individuals to receive food purchased through the use of SNAP benefits.  As set forth above, SNAP was created to provide funds to truly needy individuals to purchase food for their household.  Extending the program to those who have no such need will frustrate the underlying purpose of a governmental program with limited funds.  As Mr. Cohen stated at the hearing, none of the accommodations made by Congress allow non-eligible individuals to make use of SNAP benefits.[114]

Defendants argue that certain elements of their proposed accommodation are either allowed by the USDA or not expressly precluded.  Defendants rely heavily on accommodations made in group home settings.  In those settings, a resident may permit an authorized agent to purchase food for the household.  Defendants argue that the authorized representative could pool the SNAP benefits of multiple residents to buy in bulk.  However, the regulations make clear, that "group living arrangements which act as authorized representatives for residents of the

---

[114] Docket No. 661, at 128:16–22.

facilities must use food stamp benefits for food prepared and served to those residents participating in the Food Stamp Program."[115]

Defendants are correct that group homes need not prepare two meals: one with food obtained through SNAP benefits and one without. This may lead, in certain circumstances, to non-eligible individuals consuming food that was obtained through SNAP benefits. This sort of incidental sharing has not been a concern for USDA. But, importantly, this is not what Defendants are proposing. Defendants request an ability to donate food wholesale, without regard to eligibility, to then be consumed by individuals determined worthy by the Bishop. Defendants' proposal would fail to account for the assets of the entire community and, in that way, would further frustrate the government's stated purpose.[116] Moreover, these group living arrangements must go through an application process and are highly regulated.[117] Defendants' proposal contains insufficient safeguards to ensure that SNAP recipients obtain their proper allotment.

Having refuted the alternative schemes offered by Defendants, the Court concludes that the government has met its burden of demonstrating that the SNAP statutes and regulations are the least restrictive means of achieving its compelling interests. Therefore, Defendants' Motion to dismiss under RFRA will be denied.

---

[115] 7 C.F.R. § 273.2(n)(3); *see also* 45 Fed. Reg. 23288, 23290 (Apr. 4, 1980) ("[E]ach resident's food stamps must be used for meals intended for that resident."); Docket No. 661, at 128:9–12 ("But there is a responsibility of the home or institution, whatever it may be, to make sure that those benefits are used in a way that the food goes to the individual who has contributed those benefits.").

[116] Docket No. 661, at 157:21–158:5. Defendants' reliance on the accommodation made for some Alaskans fails for many of the same reasons.

[117] Docket No. 458 ¶ 30; Docket No. 616, at 155:11–156:1.

B.      FIRST AMENDMENT

In addition to their RFRA claim, Defendants also argue that the SNAP statutes and regulations violate the Free Exercise clause of the First Amendment.

The First Amendment states, in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[118]  In resolving challenges under the Free Exercise clause, the Court looks at neutrality and general applicability.  "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."[119]  "Thus, a law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge."[120]  "On the other hand, if a law that burdens a religious practice is not neutral or generally applicable, it is subject to strict scrutiny, and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest."[121]

"Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied.  A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest."[122]  "A law is neutral so long as its object is something

---

[118] U.S. Const. amend 1.

[119] *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

[120] *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006).

[121] *Id.*

[122] *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531–32.

other than the infringement or restriction of religious practices."[123]  "Facial neutrality is not

determinative."[124]  The Free Exercise clause "forbids subtle departures from neutrality and

covert suppression of particular religious beliefs."[125]

Defendants concede that the SNAP statutes and regulations are facially neutral.  Further,

Defendants do not appear to argue that the provisions covertly target their religious beliefs.

There is no evidence that the SNAP statutes and regulations were enacted or modified to target

the practice of FLDS members of donating their possessions.  Thus, this case is distinguishable

from *Church of the Lukumi Babalu Aye, Inc.*, where the Court found that "[t]he record in this

case compels the conclusion that suppression of the central element of the Santeria worship

service was the object of the ordinances."[126]  The ordinances there "had as their object the

suppression of religion."[127]  There is no similar evidence in the record in this case.  Instead, the

evidence shows that Congress has carefully limited the definition of "household" in an effort to

accomplish its stated goal of permitting low-income households to obtain a more nutritious diet

by increasing their food purchasing power.

Thus, the Court must consider whether the SNAP statutes and regulations are generally

applicable.  Here, it is clear that they are. The statutes and regulations apply to all who receive

SNAP benefits, without regard to their religious beliefs.  While Congress has created certain

exceptions to the definition of "household," none of those exceptions are based on the recipient's

---

[123] *Grace United*, 451 F.3d at 649–50.

[124] *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 534.

[125] *Id.* (quotation marks omitted).

[126] *Id.*

[127] *Id.* at 542.

religious beliefs.  Instead, those exceptions were made to ensure that the most vulnerable individuals have access to SNAP benefits, even when they do not reside in a traditional setting.[128]  Defendants argue that "[t]he present action applies the SNAP fraud prohibition specifically and discriminatorily against FLDS members while simultaneously allowing other groups to engage in similar communal-type living without federal prosecution."[129]  However, as set forth above, Defendants' factual premise is incorrect.  None of the exceptions created by Congress allow non-eligible individuals to make use of an eligible individual's SNAP benefits.

Defendants also argue that selective enforcement can invalidate an otherwise facially neutral statute.  Defendants appear to argue that they have been targeted because of their religious beliefs.  However, they fail to provide any factual support for this argument.  Without more, Defendants cannot prevail on their selective enforcement claim.

As the SNAP statute and regulations are neutral and generally applicable, they need only be rationally related to a legitimate governmental interest to survive a constitutional challenge.  For the same reasons set forth above, the Court concludes that the SNAP statutes and regulations are rationally related to a legitimate government interest.  Therefore, Defendants' claim under the First Amendment fails.

---

[128] Docket No. 458 Ex. 7 ¶ 25.

[129] Docket No. 269, at 37.

III.  CONCLUSION

It is therefore

ORDERED that Defendants' Motion to Dismiss Indictment (Docket No. 269) is

DENIED.  The time from the filing of the Motion through the date of this Order is excluded from

the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D).

DATED this 15th day of November, 2016.

BY THE COURT:

Ted Stewart
United States District Judge